Next case on our calendar is Carolyn Grubbs v. Lee Brown. Thanks. Council, you may proceed. May it please the Court. The District Court acknowledged in this case that the surveillance cameras in these small enclosed attorney-client interview rooms will have a chilling effect on free and open attorney-client communications. The District Court's fundamental legal error was its failure to balance that burden on attorney-client communications, that chilling effect, against the city's stated security concerns to determine whether the chilling effect, the burden, was reasonable or unreasonable under the circumstances. The reason the city, I'm sorry, the reason the District Court failed to conduct that balancing analysis was because it erroneously determined as a threshold matter that the chilling effect, the chilling effect alone, was not a legally cognizable burden on attorney-client communications because of the city's policy on its face, in theory, would not result in actual surveillance, so any chilling effect would be based on what the District Court termed the subjective impression of the detainees. And that was the error because we know from the prisoner mail cases that we've cited to this Court that a government policy that creates a fear of surveillance of attorney-client communications can be a Sixth Amendment violation, even if the government's policy on its face is not to surveil the case. So, is there a reasonable basis to, for a detainee to believe that the government is listening in to his or her conversations with counsel, but the detainee still has a subjective sense that the government, unfounded sense that the government is listening in? Is that enough to trigger a violation? Well, I think the way it's framed, if there is absolutely no reasonable basis to suspect, then I think that factors, I take the point and I think that factors into the overall reasonable analysis, which is, is the burden reasonable in light of the security concerns? And I think if there's absolutely no reasonable basis for that suspicion, then I think the answer is probably going to be, in most cases, no. As I understand it, part of the reason that you think or that you argue that there is a reasonable basis is these various violations since 1999. That's the more recent violations. That's one of the reasons. To be clear, we think that surveillance cameras placed three feet away from a detainee's face are going to, in any event, have a natural and reasonable chilling effect on attorney-client communications. But in this case, particularly on this record, there is an extensive record on which to evaluate the city's credibility when it makes representations about how it's going to use these cameras. And it is not a strong record for the city. Four times they turned the cameras on in violation of the court's order. But not only that, on day one, when we went in to seek a preliminary injunction, the city said to the district court, if you allow us to keep these cameras on, no one will have access to the recordings absent a court order. And what happened was the district court rejected the argument, ordered the cameras be turned off. We know that the cameras were turned on, notwithstanding the court's order and notwithstanding the representations that were made to the district court. It seemed, we know from the record, it seemed that virtually everyone at the Department of Correction had access to the recordings. Were they audio recordings as well as video? We have no evidence that there were audio recordings, but we do know that that a misrepresentation was made to the court about who would have access to the recordings. So we, and we, we'd be interpreting this according to the terms of the 1999 settlement. Isn't that, isn't that the document in front of us? I think, the settlement, there is certainly, that's, that's one of the things that's in front of this court. The settlement provided that the lawyers, the, these detainees and their lawyers would have the ability to consult privately, right? That's correct. And your argument is that when there's a camera in the room, that destroys the consult privately? Correct. We, we argue that the surveillance cameras by definition are the antithesis of privacy and that they. Is it right that there are, that the Federal Bureau of Prisons has surveillance cameras in these, in similar rooms? I'm not aware of that, Your Honor. I don't think it's in the record. If it were correct, wouldn't that, I mean, this, this would have ramifications not only for the city, but for the Federal Bureau of Prisons throughout the second circuit. I'm not aware of whether it's, first of all, I don't believe it's in the appellate record and I'm not personally aware of whether they do or don't, but I don't think that I want to be clear. There is not a single case, a single published decision, state or federal in any, in any jurisdiction, authorizing the prospective use of even video only surveillance cameras, at least not one that we're aware of and not one that the city has cited to. So the standards are, I understand you to be arguing the standards are different for pretrial detainees versus convicted individuals who are incarcerated. Is that right? That, that, that is correct. And I think the court, this court in Benjamin versus Fraser acknowledged that there is a distinction in, in the, in what standard applies in the, in the post-conviction context. It's whether it serves a, an important penological interest and there is a more, a more strict standard in the pre-arraignment context. And I was, I was confused, pardon me. Of all the times when a pre, a pre-arraignment detainee needs to consult his attorney, it's before he goes into court for the first time. Isn't that correct? That's absolutely correct. And I think Judge Chin, in the original decision, in the 1999 decision, Judge Chin recognized how critical it was that pre-arrangement detainees have the ability to speak openly and freely. And that's really, was the touchstone that led to the settlement. Does the record reflect in what other circumstances, if any, either the city or other Department of Corrections, Departments of Corrections, has installed cameras in attorney consultation contexts? It does. Prior to the opening of this new courthouse in Staten Island, never. Never? Never. In the history of the Department of Correction. In the, in the state of New York or the city of New York? I'm sorry. What are we talking about? There's no evidence in the record outside of the city. The affirmative evidence in the record is that in the history of New York City, prior to 2015, when the new court, courthouse opened, they had never installed or used cameras. So when the city talked about 10,000 cameras having, already being in place, what's it referring to? In the last three years. Installation in the last three years, that was, and that installation was done apparently hoping that the district court would rule in their favor. In this case, this was a test case. That's in the context, the 10,000 are in the context of pre-trial detainees citywide? I'm sorry. The reference to 10,000 cameras, I'm not sure exactly what the reference is. We know that between the opening of this courthouse in 2015 and the present day, the city has wired up other rooms in the city. I'm sorry. Other attorney client pre-arrangement and attorney client interview rooms for cameras, but hasn't yet turned the cameras on as we understand it because they're awaiting essentially the resolution. Make a distinction between pre-trial detainees and other, other potential defendant plaintiffs? I think if the court's inclined to consider a distinction, certainly at least in Benjamin versus Frazier, this court recognized that the standard would be stricter in the context of pre-trial detainees because they haven't been convicted yet. I do want to be clear about the city's security justifications here. There has been, the city went decades, really its entire history without ever installing these cameras. And then one day simply decided that they're going to install cameras without any animating security incident. In this case, there's a new courthouse and they say that the sight lines are such that security officers can't see what's going on in these interview rooms, whereas before apparently they could. So it's a courthouse design issue apparently. There was a representation made. I can tell you that I've been to the courthouse twice. You can see right into the rooms, at least the male interview rooms. There, there are glass doors. We think it was, it was perfectly reasonable for guards patrolling the area, 15 feet away to look into the rooms. What was the nature of the city's showing? What, what is in the record to support that allegation? A bare representation by a department of correction officer, I think, but I don't think there's any explanation as to what, what it is about the sight lines. So I can, I can tell you the layout. There is a holding pen. There are three interview rooms and the, the, there's a glass wall between the guard patrol hallway and the holding pen. And then on the other side of the holding pen are the, either the lead into the three interview rooms. And those are glass doors. Maybe I overlooked it, but is there a floor plan in the record before us? There is not unfortunately a floor plan in the record. There were, um, uh, the city had major security issues with us putting There is four, well, in this confidential appendix is 421, which is the plan of, for the booths themselves. Have there been any incidents? There have been zero security incidents in these rooms. Uh, nothing to justify, um, the cameras and, and to be clear, I want to be clear about one thing. We are not asking this court to disturb any of judge Daniel's factual findings about security. We're asking the court to adopt his finding and specifically the finding that the use of cameras is not the only way to address the city's security concerns. That's really, I mean, that's, that's, you say that once he made that finding clearly there are alternatives. And we think there are alternatives at a minimum. We are asking this court to vacate and remand to actually conduct the balancing test, taking into account, uh, the alternatives that are available. Counselor, you asked for the reinstatement of the preliminary injunction, but if you prevail, wouldn't a permanent injunction be more appropriate? That's correct. We would seek a permanent injunction, uh, from the district court. I think this court would also be empowered to grant the permanent injunction. We would, we would request that. Thank you. Just one more question with the president's permission. Sure. Um, the, uh, just Daniel's also made a finding that the violations were inadvertent. He did, uh, you have no, you don't challenge that. Well, I want to be clear about what the word inadvertent means, at least in one or two of the violations, the cameras were turned on very much intentionally, um, by an it individual who is simply unaware, apparently of the existence of the order. So in that sense, and, and we're accepting the city's representation in that sense, I suppose you could call it inadvertent, but it was the city's failure to make the appropriate people aware of the court's order. And we're, we're fearful that a year or two goes by and you may have a similar, you could even call it an inadvertent violation, but you're still going to have surveillance, uh, of attorney client interviews. Thank you. Thank you. We'll hear from the city. Okay. May it please the court. Um, just to respond briefly to one of, um, Mr. West comments, um, the, the security justifications were amply, amply, um, set forth in the record. There were multiple declarations setting forth these in detail and judge Daniels properly found that giving the appropriate deference to, to the institutional authorities, that these were legitimate and that the standard is, is not any sort of strict scrutiny or at least restrictive means analysis. It's the, the, the language from the Supreme court case says that prison administrators should be accorded wide ranging deference in the adoption execution of policies and practices. Even if there are alternatives. Correct. And I, and I think when, what they're, what they're determined, I'm sorry. You're saying that they don't have to use the least restrictive. Correct. This isn't a, this is not at all a strict scrutiny standard. The standard is whether it unreasonably, uh, burdens or unjustifiably obstructs your ability to consult with counsel. Um, and I privately that's the language, consult privately from the settlement agreement and the settlement agreement was reached in a context where they were pre-trial, excuse me, pre-arraignment detainees were forced to consult with their attorneys through bars and present full view and full earshot of other prisoners and court officials. Um, and the, the settlement . . . That was the motivating engine behind the 1999 settlement. Correct, Your Honor. Because they didn't have, they weren't able to consult privately. Correct, Your Honor. Um, and now they're in a position where, and again, I think this needs to be crystal clear. None of the, the 10,000 figure, Your Honor, was that system-wide. That's sort of the number. Does that involve, um, people who have been convicted or pre-trial detainees? Uh, I think both. It would depend. I, Mr. West is correct that there's, there's no, the, the right now there are only cameras in the pre-trial, pre-arraignment detainee booths in Staten Island. There's been an agreements reached to hold off on installing cameras, uh, in the pre-trial, in the pre-arraignment areas in the other boroughs. Sort of pending resolution of this case. So nothing with respect to other pre-trial detainees? No cameras? In the courthouse interview rooms. I can't, I can't say whether, well, yes, Your Honor. To the extent there are prisoners being remanded, but the . . . I have one other, just a minor question. On the notice that was provided as what would be, uh, uh, posted to advise, uh, prisoners consulting with their, uh, attorneys, um, it says that the video recordings will be kept for at least 90 days. I assume that meant no more than 90 days, or does this mean they would be kept indefinitely, stored, and then who knows what would happen to them? They're not, 90 days is the normal retention period under which they are, um, automatically written over or destroyed unless there is an incident. There's some reason to have a, um, you know, a retention. There's some sort of . . . So this means no more than, rather than at least 90 days, no more than 90 days? No more than 90 days. Unless absence of circumstance. Unless there's some sort of need to preserve it for, you know, potential litigation or something along those lines. And have there been discussions, has the district court, um, invited about the size of the white out masking area? Absolutely. That's been an ongoing issue. And as we mentioned in our brief, unfortunately, there's nothing in the, uh, record here, but there has been, uh, you know, a constant exchange by the parties of trying to get to the correct masking area and the actual masked area now is, um, is larger than what's represented on that photograph. And we'd be sort of, we can absolutely provide that to the court if the court wants us to. Uh, but the point I was getting at with the, with the 10,000 cameras, your honor, is that none of them record audio. They've never record audio. They've never recorded audio. Are they incapable of recording audio? They are. The cameras in the, um, pre arraignment booths in Staten Island are, because as an extra precaution, they were manually disabled. Um, but in order to, in order to assist . . . They are technologically able to record audio. They've been, they've been manually disabled so that they cannot record audio. And I think if this is sort of just an issue of whether there needs to be some sort of verification of that fact, that's going to be something that could be dealt with in front of the district court if that's the issue. But as I understand Appellant's argument, they still wouldn't accept video cameras in the booths. But, but there's no, the notion that they're being eavesdropped on and these is there's absolutely no basis for that. But part of the concern I think is that the mere presence of a camera, um, can chill a communication. It's a method of recording and obviously there's communication that happens with hands and in other ways as well. Right. Well, the, the, the aspect with the hands or, or perhaps even lip reading, um, that's what led to the, um, the adoption of the masking technology as a way to sort of accommodate that concern. And I think that was the way this sort of case developed. There was initial concern that, okay, you're not recording audio, but there could be nonverbal forms of communication. The cameras didn't record audio for a while, didn't they? What are those inadvertent terminals? No, Your Honor. Absolutely not. They did not. There was never audio recording? Correct. It was all video, the inadvertent, um, recording was video recording. Inadvertent recording was video recording. And the only, and talking about what being at review, the only part that was actually reviewed by anybody was one of the cameras was set up to test the masking technology. And that was done, it was turned on with knowledge and it was appropriate. What would happen was it was not unfortunately turned off when the test run was done and that footage, masked footage was reviewed. Would you just address the legal, relating to chilling or possible chilling? Chilling has been, has been recognized as a, as a, as a possible valid basis, but it's never been sort of extended to this, uh, this, this type of kind of pure speculation that the chilling would be based on mere sort of fear that someone would not comply with the court order. Um, and I think it still has to be evaluated within the context of whether something unreasonably burdens or unjustifiably obstructs. And you have a situation here where you have a prominent sign right next to where the detainees sit that apprise them that they're not being audio recorded and that if they remain in a designated area, their physical gestures cannot be captured. Um, and the cases that they rely on with the mail, I mean, you're, you're talking about sort of different technological scenarios now. I mean, this was 40 years ago and now we're in a period where cameras are much more ubiquitous. And the Supreme court never said that this credit created a constitutional floor that a pretrial detainee has an absolute right to not have, you know, sort of any doubt whatsoever or any concern. And the concerns are dealt with here through the technology, through the fact that they're not being audio recorded and the, uh, the masking technology is preventing the capture of any physical gestures. You by chance know what, um, uh, what the state of affairs is, uh, with respect to the federal Bureau of prisons. I don't, Your Honor. Again, there's no, there is nothing in the record as to what the actual practice is. The regulation does indicate that visual surveillance is permissible or even required, but audio is not, um, which is consistent with what we're doing here, how that is, uh, implemented in practice is unfortunately not part of the record. So, so I understood that the, the reason that cameras were being installed initially was that because of the design of the new courthouse, certain vision lines were impaired. But now what you're saying to me is that, as I understand it, that, um, cameras are everywhere anyway. So, um, they're helpful to us and we should be able to put them wherever we want. Is that right? That's part of it. Your Honor. I wouldn't, I wouldn't quite go that far there. They are part of limit. Tell me what limits you have. The, the, um, first of all, the security concerns aren't solely that, I mean, the sight lines are a very important part of it. Um, but it's also an attempt to, um, both facilitate, um, un, unscheduled visits throughout the day because the, the, as the schematic shows it at 421 and the confidential appendix, the detainees side of the, of the booths is located within the holding pens. Um, and we don't want to have to have a situation where there's constant physical contact or opportunity for physical contact between officers and need to enter the pen to deal with a known incident as opposed to be constantly entering the pen to do a surveillance that you couldn't do without the cameras. Newly designed building, right? It is your Honor. So, um, who is responsible for the design and the problem with sight lines and access to the booths? The people who designed the building, right? Well, the, the New York state dormitory authority is the one who designs and builds a building. I think you personally, but it is the city. No, it's a state agency. Actually, I, I, I think the record reflects that we did have this problem is you can't design a building and then complain that it's ill designed and you have to do, you have to put cameras in to correct the bad design. Well, but I mean, if the cameras, I think ultimately I'm not sure that affects the constitutional question and the question of whether it's still private. I mean, it may be, it may have been, it may have been occasioned by that design in this instance. Do you agree that pretrial detainees are entitled to a higher standard? The protection? Generally, yes. The, um, the, the level of restrictions that can be imposed on a, on a, you know, sort of a convicted prisoner, uh, or a remanded person are, are higher. And I'm right in understanding that, um, the record reflects no incidents of, uh, imported contraband or, uh, uh, problems occurring in the context of, uh, uh, detainees consulting with counsel. They have recovered, they've recovered contraband. They recovered sort of used films of, uh, I think, I think I might butcher the term, I think it's suboxone, some sort of narcotic. Um, the record as of the hearing before judge Daniels did not indicate that there were any violent incidents. So what the, what I was looking for earlier is that, you know, what is, what are the reasons and what's the support for the reasons that the city has reduced, um, uh, to, uh, well, we think the cameras, I think the cameras can help prevent that. And I think as, as judge Daniels knows, we're not kind of required to wait until it actually happens before we, it's anticipatory rather. It's anticipatory and it's based on, you know, on their own judgment and recognition of what they think is the most efficient way to utilize their staff, what's the most efficient way to do security in the prison. Um, which again, I mean, judge Daniels and I wouldn't, I don't think it goes too far to call it a finding. There's a footnote where he uses words like that's possible. Um, or one can infer that there are other ways to do this, but that's far from sort of a clear factual finding. But even if it were, I think all he's noting correctly is that there are all there could, someone else could look at this and say, oh, I think there's an alternative, but that's not the standard here. I mean, your position generally seems to be that the city should be able to use cameras, um, to record, uh, what's going on in a, in an attorney interview room with both pretrial detainees and, um, regular prisoners. Um, so long as the audio is turned off, correct. And I think, and with masks and with masks and with masking, I mean, I'm not, uh, I don't think the case law necessarily mandates masking, but we have agreed to it as an accommodation and we're, we're willing to stick with it. Thank you, counsel. Mr. West, you reserved three minutes for rebuttal. Thank you. I just want to follow up on, on something council noted, which is, um, judge Daniel's reference to the alternatives was in a footnote. The reason that you found it in a footnote and not, and not as an actual finding or not in the body of the opinion is because it's clear. And that's the reason why it's in a footnote is that he's not actually conducting a balancing test. He doesn't think it's necessary to conduct a balancing test because he didn't believe that the chilling effect was anything to balance was a cognizable, uh, intrusion on the attorney client, uh, um, the privacy of attorney, I'm sorry, on the attorney client, uh, interviews. And as we've said, the mail cases, we believe make clear that a chilling effect, even without evidence of actual surveillance can be a legally cognizable burden. So what we're saying is what the, what the judge was another way to read, which is Daniel's was saying, I think, uh, but you correct me if you think I'm is that the, there's gotta be some reasonable basis for, uh, uh, believing that it's, it's, they're, they're chill. And here you've got the masking technology, no audio inadvertent, uh, violations, uh, that, you know, you can't really anticipate will recur. Um, so why is it reasonable to, to, to feel chill? Well, I don't, I don't think judge Daniels, he certainly didn't make a finding. I mean, our argument about the chilling effect was front and center before him. And he never made a finding that it was unreasonable, uh, to, to suspect that there might be surveillance. Um, he simply, I think if you look at the, the entire chilling effect argument was disposed of in one paragraph at page 15 and 16 of the decision. And he basically says that it's just not the relevant inquiry, what people think or what they believe the relevant inquiry is the city's policy on its face. And we think that's the legal error because in the attorney mail cases and the prisoner mail cases, the premise of those decisions is that the policy alone, a stated policy that we're not going to read the mail is insufficient. You need to bring the mail to the, to the detainee or to the prisoner so they can be sure that the mail is not being read. But here we just, we have an assurance. We're not going to turn the microphone on. There is a microphone, but we're not going to turn it on. Uh, we, which we can do remotely. We're not going to disable the masking remotely. We promise not to do that, but that's unverifiable from the perspective of the detainee on the question of whether alternatives should be factored into the analysis. This court's decision in Benjamin versus Frazier makes clear that they should be, uh, the court, uh, quotes, uh, Turner versus safely a Supreme court case, which says if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid government interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard. Now I would agree that we don't have a fully developed opinion on whether, um, the, the locks would be a complete substitute for the cameras. We believe that they would. And we think the evidence shows that they would judge Daniels didn't resolve that question one way or the other, but that's the problem. We think judge Daniel should have made. So what? So let's, let's, uh, I'll agree with you that judge Daniels, uh, made a mistake, um, on the chilling part. Everything in this record, this is a question, uh, suggests that, uh, there is no reasonable reason to fear that, um, a detainee's conversation with his or her attorney will be monitored. I suppose. I just disagree with you just low here. But I could, but you agree that I could review the record independently and come to that conclusion. You, you are certainly empowered to do so. No, no question about that. We, I, we just think that the record shows, uh, alone, you've got a surveillance camera pointed at directly at your face. And I would just ask the court to consider the perspective of the detainee. And that's, that's the critical legal distinction. It's the perspective of the detainee sitting there. That was the animating purpose behind the 1999 settlement order. Can we speak freely and openly putting yourself in the position of a reasonable detainee sitting there with a camera pointed directly at your face? This is under your argument that this is a violation of the sixth amendment separate and apart from a violation of the settlement agreement. Well, you've said it's our argument. The city is the one that asked for affirmative distinct relief under the sixth amendment. We're responding to it. But yes, we believe that, that it constitutes a violation of the sixth amendment and the cameras alone would constitute, uh, would, would give rise to a reasonable chilling effect, but particularly on this record, when there's multiple repeated violations and, and while the city has claimed inadvertence, we have no basis, first of all, to verify that, but there is a record of less than good faith when it comes to how these cameras have been operating. And what's your position on the city's view that there are institutional interests, both in terms of security and for contraband purposes for, uh, you know, uh, running a prison basically, um, to have some way to monitor. This is the most efficient and effective and has other, they're making a professional judgment. Well, we think it's, first of all, we think it's contrary to the record. We took the deposition of the department of correction officer who was responsible for running day-to-day operations at the Staten Island, uh, criminal courthouse. And he testified, we asked him about each of each one of the security concerns and we asked him whether locks on the doors would address those security concerns. And to each one of those, he said, yes. In fact, judge Daniels went down to the courthouse and asked him specifically, should these doors have locks on them? He said, yes. I'm not sure how locks on the doors addresses the contraband kind of concern. Well, I suppose I'm not, I've never understood the contraband argument. Uh, the first of all, especially now that there is masking technology in the courtroom, it sort of defeats the argument that, that, that, um, contraband, I mean, these people are searched and to be clear, uh, uh, the department of correction officer who was deposed testified that there has never been a documented instance of a recovery of narcotics. So a recovery of any kind of contraband. So whatever contraband they claim was recovered, wasn't significant enough that it actually had to be logged before they enter the room. They're searched, I believe when they're arrested and they're searched before, um, they're, they're placed when they're put into DOC custody. Thank you. Thank you. Thank you. Both will reserve decision. The last two cases on our calendar are on submission. So I will ask the clerk to adjourn court. Victor come inside for a second.